******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* EDWARD VICTOR DAVIS
## (AC 36476)

Gruendel, Alvord and Dupont, Js.

Argued May 26—officially released October 6, 2015

(Appeal from Superior Court, judicial district of Hartford, geographical area number twelve, Fuger, J.)

*Peter G. Billings*, with whom, on the brief, was *Sean P. Barrett*, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Adam B. Scott*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Edward Victor Davis, appeals from the judgment of conviction, rendered after a jury trial, of one count of operating a motor vehicle with an elevated blood alcohol content in violation of General Statutes § 14-227a (a) (2), one count of bribery of a witness in violation of General Statutes § 53a-149 (a), one count of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (3) and one count of interfering with a police officer in violation of General Statutes § 53a-167a. He also appeals from the judgment of conviction, following a trial to the court, on a part B information, of being a third time offender in violation of § 14-227a (g) (3). On appeal, the defendant claims that § 53a-149 is unconstitutionally vague as applied and that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt on the bribery of a witness and the third time offender counts. We affirm the judgment of the trial court.

The following facts reasonably could have been found at trial. On November 20, 2010, the defendant and his stepson, Jonathan Oakes, were boating on the Connecticut River. While on the boat, the defendant consumed eight or nine beers. In the late afternoon, the two returned the boat to a boat launch in East Hartford, loaded it onto a trailer attached to the defendant's truck, and drove away. At approximately 4:50 p.m., the defendant and Oakes stopped at a liquor store and purchased a bottle of Peppermint Schnapps. The defendant later admitted to a police officer that he had personally consumed almost a liter of Peppermint Schnapps.

At approximately 5:30 p.m., while driving his truck on Route 83 in Manchester, the defendant collided with a vehicle that had been stopped at a traffic signal. The driver of the other vehicle, Paul Jarmoszko, testified that he initially heard tires screech and then felt "a jolt and the car got pushed forward . . . a few feet." After the accident, Jarmoszko and the defendant exited their respective vehicles.[1] Jarmoszko immediately went to inspect the damage on the rear of his vehicle, while the defendant inspected his boat. Shortly after inspecting his boat, the defendant met Jarmoszko between the two vehicles.

After observing the damage to Jarmoszko's vehicle, the defendant offered to pay him a "couple of hundred bucks . . . ." Jarmoszko rejected the offer, at which point the defendant "got agitated and said something [to the effect of] this is how it's going to be? Why don't we pull over to the side and settle it like men?" Jarmoszko, believing the defendant wanted to fight him, told the defendant he was going to contact the police and got back into his vehicle to place the phone call. While speaking to the police, Jarmoszko observed the defendant bang on his car's window several times, yell

and then walk away. Jarmoszko later heard the engine of the defendant's truck start.

Shortly afterward, Michael Magrey, a Manchester police officer, was dispatched to the scene of the accident. Magrey parked his police cruiser behind the truck and approached the vehicle's driver's side. He observed a single occupant in the driver's seat of the truck who was revving the vehicle's engine and "appeared to be out of it, under the influence of something." This individual was later identified as Oakes. Magrey asked Oakes to turn the truck's engine off, hand over the keys and step out of the vehicle. Oakes followed the officer's instructions and sat on the curb.

Magrey then went to make sure that Jarmoszko was not injured. During his interaction with Jarmoszko, Magrey was informed that Oakes was not the person Jarmoszko had observed exiting the driver's side door after the accident. On the basis of this information, Magrey asked Oakes where his companion was located, to which Oakes responded that he was "in the back." The officer eventually located the defendant lying down inside the boat. His skin appeared blue or purple, was cold to the touch, and his clothing was wet. Although initially unresponsive to questioning, the defendant's demeanor changed drastically. He became hostile and belligerent toward Magrey, yelling and cursing at him. Magrey testified that the defendant kept "coming at me" and he had to "put [the defendant] in an arm bar [to] keep him down." Eventually, another officer got into the boat and was able to assist Magrey in placing handcuffs on the defendant. The defendant remained in this state of belligerence, attempting to spit on Magrey and ambulance personnel who were attempting to treat him. He was placed on a hospital gurney, while in restraints, and taken to Manchester Hospital for treatment. The defendant was treated and later released from the hospital.

Medical records from the defendant's treatment at the hospital revealed that he had a blood alcohol content of 0.165. The defendant was subsequently arrested by officers of the Manchester Police Department. While in police custody, the defendant admitted to Magrey that he had spoken to Jarmoszko after the accident and had offered him money in order to avoid police involvement.[2] During this discussion, the defendant further admitted to having consumed almost a liter of Peppermint Schnapps prior to the accident.

The state charged the defendant with the following counts in the part A information: (1) driving under the influence, (2) bribery of a witness, (3) threatening in the second degree, (4) breach of the peace in the second degree and (5) interfering with an officer. The state also charged the defendant, under the part B information, with being a third time offender. The part A counts were tried to a jury and, at the conclusion of trial, a

verdict of guilty was returned on all counts with the exception of the threatening count. Afterward, the state proceeded on the part B information and the case was tried to the court. At the conclusion of trial, the court found the defendant guilty on the count of being a third time offender. The defendant now appeals.

## I

The defendant first claims that the evidence was insufficient to support a conviction on the charge of bribery of a witness. Specifically, he argues that the state failed to prove that Jarmoszko was a witness under the statute and that the defendant had the specific intent to influence Jarmoszko in relation to an official proceeding. We are not persuaded.

The standard of review for claims of evidentiary insufficiency is well established. "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014). "[W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 594, 72 A.3d 379 (2013).

The following additional facts are relevant to our resolution of this claim. At the conclusion of the state's case-in-chief, the defendant moved for a judgment of acquittal on the bribery count. The defendant argued that the state had failed to meet its burden of establishing, beyond a reasonable doubt, that he made the offer of money to Jarmoszko with the intent of influencing his conduct or testimony in relation to an official proceeding. He argued that the statute required the existence of an official proceeding at the time of the offer and that the state had not established the existence of an ongoing official proceeding, noting that the defendant was not arrested until months after the accident. The court then denied the motion for acquittal. On appeal, the defendant challenges the propriety of this determination.

We begin our analysis with the language of the statute at issue. Section 53a-149 (a) provides: "A person is guilty of bribery of a witness if he offers, confers or agrees to confer upon a witness any benefit to influence the

testimony or conduct of such witness in, or in relation to, an official proceeding." The state, therefore, was required to establish the following: (1) that the defendant offered, conferred or agreed to confer a benefit, (2) to a witness, (3) with the intent of influencing the witness' testimony or conduct in relation to an official proceeding.

General Statutes § 53a-146 provides statutory definitions for the terms "official proceeding" and "witness." Subdivision (1) of the statute defines an official proceeding as "any proceeding held *or which may be held* before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath," and subdivision (6) defines a witness as "any person summoned, *or who may be summoned,* to give testimony in an official proceeding." (Emphasis added.) Thus, the statute defines an official proceeding as broadly covering presently instituted proceedings, as well as future proceedings that "may be held." Accordingly, the definition of a witness includes those who have already been summoned to testify, as well as those who may be called to testify in the future. This is consistent with the purpose of the bribery and tampering statutes, which "are purposely broad and general. Their purpose is to prohibit all forms of corruption of the governmental process . . . . They broaden the field of corruption of witnesses and tampering with evidence." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 2012) §§ 53a-146 through 53a-167d, p. 288.

At trial, the defendant argued that his offer of a "couple of hundred bucks" to Jarmoszko was intended as an offer to settle a civil dispute. Specifically, the defendant asserted that, after causing the accident, the defendant offered the money as a settlement for any damage he caused to Jarmoszko's vehicle. The state argued, in contrast, that the defendant's offer was made with the purpose of keeping Jarmoszko from reporting the accident to the police. Thus, in determining the defendant's guilt as to the bribery charge, the jury was required to determine what the defendant intended when he made the offer. "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . Moreover, the [jury is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 623–24, 725 A.2d 306 (1999). "Intent may be and usually is inferred from conduct. Of necessity, it must be proved by the statement or acts of the person whose act is being scrutinized and ordinarily it can only be proved by circumstantial evidence." *Paul Bailey's, Inc.* v. *Commissioner of Motor Vehicles*, 167 Conn. 493, 498, 356 A.2d 114 (1975).

Our review of the evidence establishes that, under the facts of this case, the jury reasonably could have concluded that the defendant's offer was made with the purpose of influencing Jarmoszko's conduct and avoiding police involvement. The jury heard the testimony of Robert Powers, a doctor and an expert in the field of forensic toxicology, who testified that the defendant had an elevated blood alcohol content of 0.165 when he was treated at Manchester Hospital.[3] The jury also heard the testimony of Jarmoszko, who stated that after the accident, he witnessed the defendant get out of the driver's side of his truck. He further testified that after he declined the defendant's monetary offer, he returned to his car to call the police. While he was on the phone with the police, the defendant banged on the window of Jarmoszko's vehicle and appeared visibly agitated.[4] This evidence supports a conclusion that the defendant was driving under the influence of liquor at the time of the accident, that he was aware that he had committed a crime, and that he was concerned that he would be arrested if the police were contacted. Thus, it was reasonable for the jury to infer from the defendant's conduct, that after causing an accident while under the influence, his offer of money was made with the intention of influencing Jarmoszko's conduct.

Furthermore, Officer Magrey testified that when he arrived, he found a different person, Oakes, in the driver's seat of the truck and found the defendant lying down in the boat. The jury could infer from this evidence that, after the defendant's monetary offer was declined and the police were called, the defendant engaged in a plan to place Oakes in the driver's seat and to hide in the boat. This further supports the conclusion that the defendant's intent was to influence the conduct of a witness, rather than to offer a civil settlement. Finally, Magrey testified that, while in police custody, the defendant admitted that the purpose of his financial offer was to avoid police involvement.

The defendant argues that the statute requires the existence of an official proceeding at the time the offer was made. In particular, the defendant states that "[a]t that time, the police had not yet been called, the defendant had not yet been arrested, and there was no reason to believe that Mr. Jarmoszko may be summoned to any proceeding," and, consequently, the state failed to establish the existence of an "official proceeding" at the time the defendant made the offer. We disagree on the ground that the plain language of § 53a-146 specifically defines an official proceeding as "any proceeding held *or which may be held*" and defines a witness as "any person summoned, *or who may be summoned* . . . ." (Emphasis added.) Both of these statutory definitions encompass future proceedings that may be held and witnesses who may be summoned. Accordingly, the state was not required to establish the existence of

an official proceeding at the time of the defendant's offer.

We further note that the crime of bribery is committed as soon as the offer is made, regardless of whether it is ultimately accepted or whether the recipient ends up serving as a witness. *State* v. *Carr*, 172 Conn. 458, 468–69, 374 A.2d 1107 (1977). It is the offer, made with the intent of thwarting an official proceeding, that constitutes the crime. Thus, it is irrelevant whether the offer was made before or after the institution of an official proceeding.

Finally, the defendant argues that § 53a-149, when interpreted in relation to other bribery and tampering statutes, applies to offers made only after an official proceeding has been instituted. In support of this position, the defendant cites to the language in General Statutes §§ 53a-151 and 53a-151a, which, respectively, prohibit tampering and intimidation of a witness when the perpetrator "believ[es] that an official proceeding is pending or about to be instituted . . . ." The defendant argues that the absence of similar language in § 53a-149 leads to the conclusion that the legislature intended to criminalize bribes made only while an official proceeding is in progress. Upon review of the statutes, we conclude that the applicable language in the tampering and intimidation statutes, while absent in § 53a-149, does not support the defendant's claim.

The applicable language in §§ 53a-151 and 53a-151a places an additional burden on the state to establish that the tampering or intimidation was conducted by an actor who "believ[ed] that an official proceeding is pending or about to be instituted . . . ." This language is not, as the defendant urges, directed at whether an official proceeding has been instituted, but rather whether the perpetrator's actions were conducted *with the belief* that a proceeding has been, or is about to be, instituted. Conversely, § 53a-149 has no such language regarding the actor's beliefs. The bribery statute only requires an offer or agreement with the intent of influencing testimony or conduct. Accordingly, the absence of such language in § 53a-149 does not limit its application to bribes made only after the commencement of an official proceeding. Viewed in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient to convict the defendant on the charge of bribery of a witness.

## II

The defendant next claims that § 53a-149 is unconstitutionally vague as applied to these facts. Specifically, he claims that the terms "witness" and "official proceeding" are broadly defined and did not place him on notice that his actions could constitute criminal behavior. We disagree.

"The determination of whether a statutory provision

is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"The United States Supreme Court has set forth standards for evaluating vagueness. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . . Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. . . . Therefore, a legislature [must] establish minimal guidelines to govern law enforcement." (Citations omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 758–60, 988 A.2d 188 (2010).

We begin our analysis by first addressing the defendant's choice in framing the facts underlying his claim. The defendant argues that he was offering money to settle a dispute over damages resulting from the accident and was unaware that these actions constituted criminal conduct. This view of the facts, however, was expressly rejected by the jury when it found the defendant guilty of bribery. Inherent in the jury's determination of guilt was a finding that the defendant's offer was not intended as a settlement offer, but rather, was intended to encourage Jarmoszko to forgo contacting

the police. "Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Osoria*, 86 Conn. App. 507, 515, 861 A.2d 1207 (2004), cert. denied, 273 Conn. 910, 870 A.2d 1082 (2005). In part I of this opinion, we determined that there was ample evidence to support the jury's determination of guilt as to the bribery of a witness charge. Our role is not to sit as a seventh juror; *State* v. *Glasper*, 81 Conn. App. 367, 372, 840 A.2d 48, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004); and, accordingly, we defer to the jury's factual determination as to the defendant's intent when he made the offer.

In light of these factual determinations, the statute is not unconstitutionally vague as applied to the defendant's conduct. Although the defendant correctly points out that there has been no prior case law interpreting § 53a-149 and that the terms "official proceeding" and "witness" are broadly defined, this, on its own, does not amount to a deprivation of due process. A person of ordinary intelligence, in the defendant's position, would have been on notice that by driving a motor vehicle under the influence of a substantial amount of alcohol, he was violating the law. See *Provident Bank* v. *Lewitt*, 84 Conn. App. 204, 209, 852 A.2d 852 ("everyone is presumed to know the law, and . . . ignorance of the law excuses no one" [internal quotation marks omitted]), cert. denied, 271 Conn. 924, 859 A.2d 580 (2004). A person of ordinary intelligence would also have been aware that Jarmoszko had experienced the accident, had observed the defendant's conduct after the accident, and may have wanted to contact the police to report the accident. Finally, a person of ordinary intelligence could presume that any subsequent police investigation could reveal the defendant's blood alcohol content, which would likely result in criminal charges. Given these facts, the defendant had reasonably adequate notice that, after driving under the influence of alcohol, his efforts to alter the conduct of a likely adverse witness would constitute bribery of a witness under the statute.

This conclusion is further bolstered by the fact that § 53a-149 is a specific intent crime. It is well established that "when a criminal statute is imprecise in describing the actions it proscribes, the presence of a specific intent requirement can temper that imprecision, thus clarifying the meaning of the statute, narrowing its application, and purg[ing] a potentially vague [provision] of constitutional infirmity." (Internal quotation marks omitted.) *State* v. *Winot*, supra, 294 Conn. 766. The "requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of [a statute]

would be so unfair that it must be held invalid." *Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 342, 72 S. Ct. 329, 96 L. Ed. 367 (1952). Section 53a-149 requires that the act be made with the intent of "influenc[ing] testimony or conduct," thus clarifying and narrowing the scope of conduct prohibited under the statute.[5]

### III

The defendant also challenges the evidentiary sufficiency of his conviction on the part B information charging him as a third time offender pursuant to § 14-227a (g) (3).[6] Specifically, the defendant contends that the evidence presented was insufficient to identify him as the same person who was convicted in the two prior judgments.[7]

The following procedural history is relevant to our resolution of the defendant's claim. After the jury found the defendant guilty of driving under the influence of liquor, the state proceeded on the part B information, charging him as a third time offender. The defendant waived his right to a jury trial on this count, and the case was tried to the court. At trial, the state offered the testimony of Antonio D'Addeo, an attorney in the clerk's office of the Manchester Superior Court. The state also offered documentary evidence in the form of a certified copy of a 2007 judgment from the Manchester Superior Court as well as a document identified as a copy of a 2000 judgment mittimus. D'Addeo testified that the certified copy of the judgment confirmed that a person with the defendant's name and date of birth was convicted of driving under the influence on October 23, 2007. D'Addeo then testified that the judgment mittimus document reported that a person with the defendant's name and date of birth was also convicted of driving under the influence on March 23, 2000. At the conclusion of trial, the court found the defendant guilty of being a third time offender. In reaching its guilty determination, the court made a finding that the identifying information in the documents matched the defendant's date of birth and home address. The court also found that the documentary evidence sufficiently identified the defendant as having been previously convicted on two separate occasions. We now review the sufficiency of that determination.

We begin by setting forth the state's burden in prosecuting a charge of operation of a motor vehicle as a third or subsequent offender. This court has previously held that "in most cases requiring the state to prove beyond a reasonable doubt that the defendant previously has been convicted of a prior offense, that burden will be met by the admission of a certified copy of a judgment of conviction that contains the critical information giving rise to the conviction, including identification of the particular statute pursuant to which the defendant was convicted." *State* v. *Tenay*, 156 Conn.

App. 792, 808–809, 114 A.3d 931 (2015). We have held that information such as name, address, date of birth, physical description, and operator's license number are all indicators that may be used for identification purposes; *State* v. *Hodkoski*, 146 Conn. App. 701, 721, 78 A.3d 255 (2013); and that not all indicators are required in order to determine that the defendant was the same person who had been previously convicted. *State* v. *Windley*, 95 Conn. App. 62, 67, 895 A.2d 270, cert. denied, 278 Conn. 924, 901 A.2d 1222 (2006).

Construing the evidence in the light most favorable to sustaining the conviction, we conclude that there is ample evidence in the record to support the defendant's conviction. The certified copy of the judgment in the 2007 conviction listed a name, date of birth, and home address matching the defendant's information. This court has previously held that a certified copy of a judgment listing these indicators is sufficient to support a conviction. See *State* v. *Gordon*, 84 Conn. App. 519, 534, 854 A.2d 74, cert. denied, 271 Conn. 941, 861 A.2d 516 (2004); see also *State* v. *Gallichio*, 71 Conn. App. 179, 190, 800 A.2d 1261 (2002) (evidence of identical names alone was insufficient to prove defendant was person previously convicted). Moreover, the 2007 judgment document included an attached motor vehicle summons and complaint, which listed a social security number and physical description matching that of the defendant.[8]

We also note that this court has previously held that a certified copy of a judgment of conviction showing that the defendant was sentenced as a second time offender is sufficient evidence to establish the existence of the defendant's first offense. *State* v. *Gordon*, supra, 84 Conn. App. 534. In *Gordon*, this court reasoned: "For the defendant to be sentenced as a second time offender under [the statute], the court necessarily had to find that he had been convicted of a prior offense. That finding is embraced in the defendant's judgment of conviction as a second time offender. The defendant's first conviction having been actually litigated and necessarily determined for his conviction as a second time offender, the defendant's claim that his conviction as a second time offender cannot establish his first conviction necessarily is barred by collateral estoppel." Id., 533 n.4. Accordingly, even if we were to assume that the evidence of the 2000 conviction was deficient, the 2007 judgment confirmed the first conviction by incorporation and was thus sufficient to establish proof of the defendant's two prior convictions.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] At trial, Jarmoszko positively identified the defendant as the operator of the vehicle. He testified that the operator of the truck was a white male, approximately six feet, one inch tall, with long curly hair who weighed about 230 or 240 pounds.

[2] The following colloquy occurred at trial:

"[The Prosecutor]: Okay. And did he talk to you about the victim's vehicle?

"[Magrey]: He had mentioned, not specifically about, like, damage to the vehicle or anything like that.

"[The Prosecutor]: Yeah.

"[Magrey]: But he had mentioned that he had spoken with the victim.

"[The Prosecutor]: Okay. And what did he say?

"[Magrey]: He said that he had offered to buy his car for him and not have police involved.

"[The Prosecutor]: All right. And specifically said, keep the police out—not have the police involved?

"[Magrey]: Something to that effect. Yes."

[3] A person has an elevated blood alcohol content when he or she has "a ratio of alcohol in the blood of such person that is eight-hundreds of one per cent [(0.08)] or more of alcohol, by weight . . . ." General Statutes § 14-227a (a) (2).

[4] Jarmoszko also testified that the defendant's automobile insurance covered the entirety of repairs to Jarmoszko's vehicle. The insurance company paid for these repairs without questioning the defendant's liability.

[5] In his brief, the defendant argues that "any person involved in a car accident could be classified under this definition and therefore any presuit settlement offer could arguably fall under [the bribery statute]. . . . It simply cannot be the case that every civil settlement offer constitutes a violation of this statute." We agree that a monetary offer, made with the intent of settling a civil dispute should not, and in fact does not fall within the ambit of § 53a-149. We note, however, that the jury in this case did not find that to be the defendant's underlying intent. Under the bribery statute, it is the intent of the actor that dictates whether his or her conduct is criminal. In reaching our decision, we emphasize the distinction between offers to settle civil disputes on the one hand, and attempts to influence official proceedings through the use of financial offers. *Allstate Ins. Co.* v. *Mottolese*, 261 Conn. 521, 531, 803 A.2d 311 (2002) ("[p]ublic policy favors and encourages the voluntary settlement of civil suits").

[6] General Statutes § 14-227a (g) provides in relevant part: "Any person who violates any provision of subsection (a) of this section shall . . . (3) for conviction of a third and subsequent violation within ten years after a prior conviction for the same offense, (A) be fined not less than two thousand dollars or more than eight thousand dollars, (B) be imprisoned not more than three years, one year of which may not be suspended or reduced in any manner, and sentenced to a period of probation requiring as a condition of such probation that such person: (i) Perform one hundred hours of community service, as defined in section 14-227e, (ii) submit to an assessment through the Court Support Services Division of the Judicial Branch of the degree of such person's alcohol or drug abuse, and (iii) undergo a treatment program if so ordered, and (C) have such person's motor vehicle operator's license or nonresident operating privilege permanently revoked upon such third offense, except that if such person's revocation is reversed or reduced pursuant to subsection (i) of section 14-111, such person shall be prohibited from operating a motor vehicle unless such motor vehicle is equipped with a functioning, approved ignition interlock device, as defined in section 14-227j, for the time period prescribed in subdivision (2) of subsection (i) of section 14-111. . . ."

We note that although § 14-227a (g) was amended since the date of the crimes at issue; see Public Acts 2012, No 12-178, § 2; the changes are not relevant to the merits of this appeal. For convenience, we refer to the current revision of the statute.

[7] The defendant also argues on appeal that the state failed to prove the allegations contained within the part B information. Specifically, the defendant claims that, although the part B information alleged that he was previously convicted on January 19, 2000, the evidence at trial only purported to show a prior conviction on March 23, 2000. We conclude that this claim is without merit. It is well established that "it is not essential in a criminal prosecution that the crime be proved to have been committed on the precise date alleged, it being competent ordinarily for the prosecution to prove the commission of the crime charged at any time prior to the date of the complaint and within the period fixed by the statute of limitations." (Internal quotation marks omitted.) *State* v. *Morrill*, 197 Conn. 507, 552, 498 A.2d 76 (1985).

[8] The physical description in the summons and complaint listed the perpetrator as a white male, six feet, four inches tall, with blue eyes, blonde hair, and weighing approximately 300 pounds. In the present case, the defendant's

uniform arrest report listed the defendant as a white male, six feet, two inches tall, with blue eyes, blonde hair, and weighing 300 pounds.

---